Gill Law Firm Mail - Re: Lawsuits filed against your clients Apex and Hassan

**EXHIBIT 3**

 **Gmail**

**Faisal Gill <fgill@glawoffice.com>**

## Re: Lawsuits filed against your clients Apex and Hassan
1 message

**Joe Sibley** <sibley@camarasibley.com>                                          Mon, Apr 27, 2020 at 2:56 PM
To: Faisal Gill <fgill@glawoffice.com>

See attached.

On Mon, Apr 27, 2020 at 4:42 PM Faisal Gill <fgill@glawoffice.com> wrote:

> Mr. Sibley,
>
> I will check on acceptance of service.  As for cease and desist, unless you can provide me a non circumvention
> agreement, we will continue to communicate and do business.  I noticed no such agreement is attached.
>
> Sincerely,
> Faisal
>
> On Mon, Apr 27, 2020 at 2:17 PM Joe Sibley <sibley@camarasibley.com> wrote:
>
>> Mr. Gill,
>>
>> Please see attached two lawsuits filed against your clients, Apex RX Solutions, LLC and Sohail Hassan.  One is in
>> federal court for the SD of TX (filed by MediaWerks) and one in Harris County District Court (filed by F5).
>>
>> Please let me know if you will accept service for your clients.
>>
>> In addition, please cease and desist any contact with Meijer as this violates the 1) non-circumvention agreement, 2)
>> non-circumvention clauses in the commission agreements and 3) additionally, in the case of Meijer, email
>> communication between Meijer, Sohail, and Bill requiring he be included in all communications.
>>
>> Please also preserve all communications and other documents that relate to the dispute.
>>
>> Regards,
>>
>> Joe Sibley
>>
>> --
>> Gill Law Firm
>> 1155 F Street NW
>> Suite 1050
>> Washington, DC 20005
>> 202-570-8223
>> 202-318-4331 (fax)

**2 attachments**

 **Apexsigned.pdf**
183K

**ApexNDA.pdf**
221K

**CONSULTING SERVICES AGREEMENT**

This Consulting Agreement (this "Agreement") is entered into as of March 20, 2020 by and between Apex Rx Solutions (the "COMPANY"), a limited liability company organized under the laws of the State of Texas, and F5 Financial Inc. (the "CONSULTANT"), a limited partnership organized under the laws of the State of Texas.

WHEREAS, the COMPANY is in the business of developing SUPPLIERS, WHOLESALERS, AND CONTACTS in the space of trade: Health care masks, gloves, uniforms, and Hand Sanitizers and has confidential information concerning ("**Opportunity**") that will be shared with CONSULTANT, and ("**PURCHASERS**) that will consider purchasing in this Opportunity.;

WHEREAS, CONSULTANT will provide business consulting support and advice to COMPANY.

Now, therefore, COMPANY desires to retain CONSULTANT to perform consulting services for the COMPANY, on the terms described below. In consideration of the mutual promises contained herein, the parties agree as follows:

1.      *Services*. The term "Services" shall include business consulting services, introduction to PURCHASERS, and strategic advice. CONSULTANT warrants that Services shall be performed in a good and workmanlike manner in accordance with the highest professional standards. Consultant agrees to comply with all federal, state, and local statutes, laws, ordinances, regulations, rules, and codes bearing on the conduct of the Services. Consultant may subcontract certain portions of these Services performed under this Agreement.

2.      *Compensation*. For the performance of Services, COMPANY, shall compensate CONSULTANT as outlined below in Exhibit A. Payment shall be made by COMPANY to CONSULTANT upon receipt funds from the PURCHASER.

3.      *Confidentiality*.

(a)      *Definition*. "Confidential Information" means any information that relates to the actual  or anticipated business or research and development of either COMPANY or CONSULTANT, technical data, trade secrets or know-how, including, but not limited to, research, product plans or other information regarding either COMPANY or CONSULTANT's products or services and markets therefore, client lists and clients (including, but not limited to, clients of COMPANY or CONSULTANT with whom the other company became acquainted during the term of this Agreement), software, developments, inventions, processes, formulas, technology, designs, drawing, engineering, hardware configuration information, marketing, finances, investment strategies, or other business information. Confidential Information does not include information that (i) either COMPANY or CONSULTANT can demonstrate was rightfully in its possession prior to disclosure to the other company, (ii) is now, or hereafter becomes, through no act or failure to act on the part of either COMPANY or CONSULTANT, generally known or available in the public domain or (iii) is obtained by either COMPANY or CONSULTANT from a third party without a breach of any obligation to the other company.

(b)      *Non-Use, Non-Disclosure & Non-Circumvention*. COMPANY and CONSULTANT will not, during or subsequent to the term of this Agreement, use the Confidential Information for any purpose whatsoever other than the performance of the Services on behalf of the other company or disclose the Confidential Information to any third party. COMPANY and CONSULTANT each agree that all Confidential Information will remain the sole property of the other company. COMPANY and CONSULTANT each also agree to take all reasonable precautions to prevent any unauthorized disclosure of such Confidential Information, including, but not limited to, having each of the company's employees or contractors, if any, with access to any Confidential Information execute a nondisclosure & non circumvention agreement containing provisions in the other company's favor at least as restrictive as the provisions in this Section 2. Without the CONSULTANT's prior written approval, the COMPANY will not directly or indirectly approach other consultants related to this OPPORTUNITY or the

1

PURCHASER.

        (c)    *Third Party Confidential Information*. COMPANY and CONSULTANT each recognize that the other company has received and, in the future, will receive from third parties their confidential or proprietary information subject to a duty on the other company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. COMPANY and CONSULTANT each agree that, during the term of this Agreement and thereafter, that COMPANY and CONSULTANT owe the other company and such third parties a duty to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out the Services for the other company consistent with the other company's agreement with such third party.

        4.    *Ownership*.

        (a)    *Assignment*. COMPANY and CONSULTANT each agree that all copyrightable material, notes, records, models, developments, discoveries and trade secrets conceived, discovered, developed or reduced to practice by the company, solely or in collaboration with others, during the term of this Agreement that are specifically related to the business of the company that the other company may be directed to undertake, investigate or experiment with or that the company may become associated with in work, investigation or experimentation in the other company's line of business in performing the Services under this Agreement (collectively, "Inventions"), are the sole property of the other company. COMPANY and CONSULTANT each also agree to assign (or cause to be assigned) and hereby assigns fully to the other company, all Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating to all Inventions.

        (b)    *Further Assurances*. COMPANY and CONSULTANT each agree to assist the other company, or its designee, at the other company's expense, in every proper way to secure the other company's rights in securing and any copyrights, patents, mask work rights or other intellectual property rights relating to all Inventions in any and all countries, including the disclosure to the other company of all pertinent information and data with respect to all Inventions, the execution of all applications, specifications, oaths, assignments and all other instruments that the other company may deem necessary in order to apply for and obtain such rights and in order to assign and convey to the other company, its successors, assigns and nominees the sole and exclusive right, title and interest in and to all Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating to all Inventions. COMPANY and CONSULTANT each also agree that each company's obligation to execute or cause to be executed any such instrument or papers shall continue after the termination of this Agreement. The terms of this agreement apply to this and any other OPPORTUNITY brought to the COMPANY by the CONSULTANT.

        5.    *Conflicting Obligations*.

        (a)    *Conflicts*. COMPANY and CONSULTANT each certify that each company has no outstanding agreement or obligation that is in conflict with any of the provisions of this Agreement or that would preclude the company from complying with the provisions of this Agreement. COMPANY and CONSULTANT each agree they will not enter into any such conflicting agreement during the term of this Agreement.

        6.    *Reports*. COMPANY and CONSULTANT each agree that each company will, from time to time during the term of this Agreement or any extension thereof, keep the other company advised as to the company's progress in performing the Services under this Agreement.

7.      *Term and Termination.*

(a)      *Term.* The term of this Agreement will begin on the date of this Agreement and will continue until termination as provided in Section 6(b).

(b)      *Termination.* Either COMPANY or CONSULTANT may terminate this Agreement upon giving sixty (60) days prior written notice of such termination. Either COMPANY or CONSULTANT may terminate this Agreement immediately and without prior notice if the other company refuses to or is unable to perform the Services or is in breach of any material provision of this Agreement.

(c)      *Survival.* Upon such termination, all rights and duties of COMPANY and CONSULTANT toward each other shall cease except: Either COMPANY or CONSULTANT will pay, within 30 days after the effective date of termination, all amounts owing to the other company for Services completed and accepted by the company prior to the termination date and related expenses, if any, submitted in accordance with the other company's policies and in accordance with the provisions of Section 1 of this Agreement; and Section 2 (Confidentiality), Section 3 (Ownership), Section 4 (Conflicting Obligations), Section 7 (Independent Contractor;), and Section 8 (Indemnification) will survive the termination of this Agreement.

8.      *Independent Contractor; Benefits.*

(a)      *Independent Contractor.* It is the express intention of both COMPANY and CONSULTANT that the company performs the Services as an independent contractor to the other company. Nothing in this Agreement shall in any way be construed to constitute the company as an agent, employee or representative of the other company. Without limiting the generality of the forgoing, either company is not authorized to bind the other company to any liability or obligation or to represent that the company has any such authority. COMPANY and CONSULTANT each acknowledge and agree that each company is obligated to report as income all compensation received by the other company pursuant to this Agreement. COMPANY and CONSULTANT each acknowledge that it is responsible for the satisfaction its own obligations as a result of such income received; including, but not limited to, all taxes.

9.      *Indemnification.* COMPANY and CONSULTANT each agree to indemnify and hold harmless the other company from and against all taxes, losses, damages, liabilities, costs and expenses, including attorneys' fees and other legal expenses, arising directly or indirectly from or in connection with (i) any negligent, reckless or intentionally wrongful act of COMPANY or CONSULTANT's assistants, employees or agents, (ii) any breach by COMPANY or CONSULTANT's assistants, employees or agents of any of the covenants contained in this Agreement, (iii) any failure of COMPANY or CONSULTANT to perform the Services in accordance with all applicable laws, rules and regulations, or (iv) any violation or claimed violation of a third party's rights resulting in whole or in part from COMPANY or CONSULTANT's use of the work product of the other company under this Agreement.

10.      *Miscellaneous.*

(a)      *Governing Law.* The laws of Texas without regard to Texas's conflicts of law rules shall govern this Agreement.

(b)      *Assignability.* Except as otherwise provided in this Agreement, COMPANY or CONSULTANT's may not sell, assign or delegate any rights or obligations under this Agreement.

(c)      *Entire Agreement.* This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior written and oral agreements between the parties regarding the subject matter of this Agreement.

2

(d)    *Headings.* Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

(e)    *Notices.* Any notice or other communication required or permitted by this Agreement to be given to a party shall be in writing and shall be deemed given if delivered personally or by commercial messenger or courier service, or mailed by U.S. registered or certified mail (return receipt requested), or sent via facsimile (with receipt of confirmation of complete transmission) to the party at the party's address or facsimile number written below or at such other address or facsimile number as the party may have previously specified  by like notice. If by mail, delivery shall be deemed effective 3 business days after mailing in accordance with this Section 9(e).

| | |
|---|---|
| If to COMPANY, to: | Apex Rx Solutions, LLC, c/o Sohail Hassan<br>9100 Southwest Freeway, Suite 201<br>Houston, Texas 77074<br>Tel. 281-948-3199<br>Sohail.Hassan@ApexGroupofCompanies.com |
| If to CONSULTANT, to: | F5 Financial Inc.<br>James Butler III<br>777 Preston Street<br>Houston, Texas 77002 |

(f)    *Attorneys' Fees.* In any court action at law or equity that is brought by one of the parties to this Agreement to enforce or interpret the provisions of this Agreement, the prevailing party will be entitled to reasonable attorneys' fees, in addition to any other relief to which that party may be entitled.

(g)    *Severability.* If any provision of this Agreement is found to be illegal or unenforceable, the other provisions shall remain effective and enforceable to the greatest extent permitted by law.

*[Remainder of this page intentionally left blank]*

3

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**Apex Rx Solutions, LLC**
**a Texas limited liability company**

COMPANY

_____

By: Sohail Hassan, President


**F5 Financial Inc.**
**a Texas Company**

CONSULTANT

_____

By: James Butler III

Title:<u>President</u>

**EXHIBIT A**

Services and Compensation

1.       Services.

The Services COMPANY and CONSULTANT each agree to perform for the other company are described below in this Exhibit "A" (the "Services"), and COMPANY and CONSULTANT each agree to pay the other the compensation described below in this Exhibit "A" for the performance of the Services. The Services shall include, but shall not be limited to, the following:

Introduction to buyers of Hand Sanitizers.

2.       Compensation.

For performance for Services for COMPANY, COMPANY shall pay CONSULTANT as follows:

- **Commission** –
  - o   20% of the profit above $1.55 for 4oz Hand Sanitizer Bottles
  - o   20% of the profit above $2.55 for 8oz Hand Sanitizer Bottles
  - o   20% of the profit above $3.15 for 16oz Hand Sanitizer Bottles
  - o   20% of the profit above $5.60 for 1-liter Hand Sanitizer Bottles

## NON-CIRCUMVENTION, NON-DISCLOSURE AGREEMENT

This mutual Non-Circumvention, Non-Disclosure Agreement (this "NCNDA") is entered into as of this ____24____ day of March, 2020 (the "Effective Date") by and between the following designated parties: Apex Rx Solutions, a limited liability company ("Apex" or "Company"), on the one hand, and _____MediaWerks Publishing, LLC_("Consultant")_____, a _____Delaware incorporated Limited Liability Company on the other hand. Consultant and Company are each referred herein to individually as a "Party" or collectively as the "Parties."

WHEREAS, the Parties wish to explore a possible business opportunity of mutual interest relating to the sale of products from sellers to buyers (the "Proposed Relationship") in connection with which the Parties may disclose or further disclose (as the case may be) any of their "Proprietary Information" (defined hereunder) to the other party;

WHEREAS, the Parties desire to enter into this NCNDA to continue to discuss and evaluate the potential transactions while protecting their Proprietary Information and any other "Legitimate Business Interests" (defined hereunder) against unauthorized use or disclosure.

WHEREAS, Company and Consultant are working to facilitate transactions of certain items of specialty medical and sanitary equipment, including, but not limited to sanitizer, N95 grade facemasks, respirators, and PPE

WHEREAS, to allow the Parties to evaluate their interest in, and the feasibility of cooperation the Parties shall share Proprietary Information and potential buyer and supplier relationships with each other, with a Party disclosing Proprietary Information referred to as the "Disclosing Party" for purposes of this NCNDA, and the Party receiving disclosed Proprietary Information referred to as the "Receiving Party" for purposes of this NCNDA; and

WHEREAS, the Parties wish to set forth the terms and conditions for the mutual disclosure of information relating to the Parties and the future business relationships.

NOW, THEREORE, having acknowledged and confirmed the receipt of valuable and sufficient consideration in exchange for the mutual promises, covenants and obligations described below, the Parties agree to be bound to the following terms and conditions:

1. Confidentiality of Proprietary Information.

a. Proprietary Information. Either Party (the "Disclosing Party") may furnish or, since the Inception Date, already has furnished to the other Party (the "Receiving Party") certain information including, but not limited to, **the names, identifies, and contact information of brokers, suppliers, and buyers**, business plans, information and knowledge regarding products, formulations, processes, techniques, specifications, trade secrets, strategies and programs, financial data and projections, vendor and customer relationships, sales information, construction designs and plans, property locations, methods of operation and other proprietary information or materials in any form (including without limitation, in electronic media), the names of the Disclosing Party and/or the Receiving Party and/or the description or existence of the Transaction, and, whether prepared by the Disclosing Party or others, which contain or otherwise reflect such information (all of the foregoing, "Proprietary Information"). Information need not be marked or identified as "confidential" or "proprietary" as a precondition to these protections. For

the avoidance of doubt, Proprietary Information also includes introductions to third parties including investors, service providers, brokers, suppliers and potential, buyers and potential buyers, potential partners and other potentially valuable persons or entities.

b. Exclusions. Proprietary information does not include information that:

(i) is or becomes generally available to the public other than as a result of disclosure by the Receiving Party or its Representatives in breach of this Agreement,

(ii) if it needs to be shared to a broker or supplier to close a contemplated transaction of the Company's product

Non-Circumvention, Non-Disclosure Agreement Mutual, ImpactX Page 1

(ii) was in the possession of the Receiving Party or its Representatives on a non- confidential basis prior to its disclosure as shown by written records,

(iii) is independently developed without use of the Proprietary Information as shown by written records, or

(iv) is received thereafter by the Receiving Party or its Representatives from a source

other than the Disclosing Party or its Representatives, provided that such source is not known by the Receiving Party to be bound by a confidentiality agreement with the Disclosing Party or its Representatives, or otherwise prohibited from transmitting the information to the Receiving Party by contractual, legal or fiduciary obligation.

Proprietary Information shall not be deemed to be within the foregoing exclusions merely because it is embraced by more general information fitting within the exceptions. In addition, any combination of information shall not be deemed to be within the exclusions merely because individual parts of the information fit within the exclusions, but only if the combination itself fits within the exceptions.

Company and Consultant (collectively, "Counterparties" and individually, "Counterparty") both agree not to monetize or use the counterparty's referred or disclosed contacts for a period of 3 years from the effective date of this contract to make a profit, without the written permission of the counterparty.

c. Obligations Regarding Proprietary Information. The Receiving Party shall maintain the Disclosing Party's Proprietary Information in strict confidence and may not disclose such Proprietary Information to any person, except as provided herein. Each Party recognizes and acknowledges the competitive value and confidential nature of the Proprietary Information and the damage that could result to the Disclosing Party if information contained therein were disclosed to any third party. Each Party agrees that the Proprietary Information provided by the Disclosing Party will not be used for any other purposes of any nature, including, without limitation, in any manner directly or indirectly competitive with or otherwise actually or potentially detrimental to the Disclosing Party. The Receiving Party shall promptly notify the Disclosing Party of any unauthorized use, knowledge, disclosure or loss of the Disclosing Party's Proprietary Information. The obligations of this section shall last three (3) years after the Effective Date; for any trade secret, for such longer period that a trade secret remains secret; and in perpetuity for all non-public personally identifiable information of a natural person.

d. Representatives. The provisions of this NCNDA extend to the partners, directors, officers, employees, agents, advisors, affiliates, subcontractors, or authorized representatives of the Parties (all of the foregoing collectively referred to as "Representatives"), which may receive Proprietary Information of the other Party only on a "need to know" basis. The Receiving Party shall make its Representatives aware of the confidential nature of the Proprietary Information and the restrictions imposed by this NCNDA, and the Receiving Party agrees that it shall be responsible for any breach of this NCNDA by its Representatives.

e. Legally Required Disclosure. In the event the Receiving Party is legally required to disclose any of the Proprietary Information (whether by deposition, interrogatory, subpoena, court order or similar process or under applicable law), the Receiving Party shall provide the Disclosing Party with prompt notice of such requirement so that the Disclosing Party may seek an appropriate protective order or other appropriate remedy and/or provide a waiver under this NCNDA to permit such disclosure. In the event that such protective order or other remedy is not obtained, and the Disclosing Party does not grant a waiver hereunder, the Receiving Party may furnish that portion (and only that portion) of the Proprietary Information which, upon reasonable advice of counsel to the Receiving Party, is legally required to be disclosed by applicable law or court order, and will exercise its best efforts to obtain reliable assurance that confidential treatment will be accorded the Proprietary Information so furnished.

f. Return of Proprietary Information. The Receiving Party shall promptly, upon the written request of the Disclosing Party, deliver to the Disclosing Party all documents or other materials furnished by the Disclosing Party or its Representatives to the Receiving Party or its Representatives constituting Proprietary Information, together with all copies thereof, in the possession or under the control of the Receiving Party or its Representatives. In the event of such written request, all other documents or materials constituting Proprietary Information in the possession or under the control of the Receiving Party or its Representatives shall be destroyed, with any such destruction confirmed by the Receiving Party in writing to the Disclosing Party.

2. Legitimate Business Interest. A "Legitimate Business Interest" for purposes of this NCNDA includes, but is not limited to: 1) Trade Secrets, as defined under Federal statutes or the statutes of any State of the United States where such Trade Secrets may be found; 2) Valuable confidential business or professional information that otherwise does not qualify as Trade Secrets; 3) Substantial relationships with specific prospective or existing customers, patients or clients; 4) Customer, patient, or client goodwill associated with: (a) an ongoing business or professional practice, by way of trade name, trademark, service mark, or trade dress; (b) a specific geographic location; or (c) a specific marketing or trade area; and 5) extraordinary or specialized training. Any restrictive covenant not supported by a legitimate business interest is unlawful and is void and unenforceable.

3. Non-Circumvention and Non-Solicitation. While this NCNDA remains in effect, and for a period of three (3) years after termination of this NCNDA, neither Party shall solicit or accept funds, information or any transaction of any nature, whether or not the transfer of funds is involved, directly or indirectly, from any from any (past, present, or prospective) client, investor, business partner, researcher, general partner, limited partner, prospective partner, shareholder, service provider or associate of the other party (each, an "Exclusive Contact"), unless the other party had a relationship with such Exclusive Contact pre-dating the Inception Date. Additionally, the Parties agree that during the Term of this NCNDA, the Parties will not directly or indirectly: (a) encourage any Exclusive Contact to turn down,

terminate or reduce a business relationship with the other party; or (b) hire, solicit, recruit, induce, procure or attempt to hire, any person who is a prospective or current member of the other Party.

Any potential buyer or broker introduced by Consultant to Company will be covered under this Agreement for a period of 3 years – Company agrees not to engage in business with an introduced broker or buyer for a period of three years without Consultant's permission.

4. No Rights Conferred. All Proprietary Information disclosed under this NCNDA shall be and remain the property of the Disclosing Party, and nothing contained in this NCNDA shall be construed as granting or conferring any rights to such Proprietary Information to the Receiving Party. Nothing herein shall authorize the use in advertising, publicity or otherwise of any trade name or trademark of any product, or any contraction, abbreviation or simulation thereof, which is owned, to such Party's knowledge, by the other Party or any affiliate of the other Party. No right, license, property, interest or commercial right to use the Proprietary Information, including the filing of any patent application, is granted to the Receiving Party.

5. Term; Termination. The terms and conditions of this NCNDA shall commence as of the Effective Date, and continue until terminated, or at least a period of three (3) years, whichever is longer. Either Party may terminate this agreement within thirty (30) days upon written notice of termination to the other Party, with the understanding that each Party's confidentiality obligations (Section 1) and non-circumvention obligations (Section 3) and commission payment obligations on introduced parties survive termination of this NCNDA for a period of three years, respectively.

6. Warranties/Liability. ALL PROPRIETARY INFORMATION IS PROVIDED "AS IS." THE DISCLOSING PARTY MAKES NO WARRANTIES AND ASSUMES NO LIABILITIES OF ANY KIND, EXPRESS, IMPLIED OR OTHERWISE, REGARDING ITS FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, NON-INFRINGEMENT OR THIRD PARTY RIGHTS, COMPLETENESS, ACCURACY, CORRECTNESS OR PERFORMANCE.

7. Equitable Relief for Breach. The Parties agree that the Disclosing Party will suffer irreparable injury if its Proprietary Information is made public, released to a third party, or otherwise disclosed or used in breach of this NCNDA. Each Party acknowledges that money damages would be both difficult to calculate and an insufficient remedy for any breach of this NCNDA. The Disclosing Party shall be entitled to obtain equitable relief for actual breach, to prevent a threatened breach and to cease the continuation of any breach, including injunctive relief, specific performance and restitution to avoid or remedy any unjust enrichment resulting from the Receiving Party's breach or any unauthorized use of the Disclosing Party's Proprietary Information.

8. Independent Development. The terms of this Agreement shall not be construed to limit either Party's right to develop independently or acquire products or services without the use of Proprietary Information belonging to the other Party. The Disclosing Party acknowledges that the Receiving Party may currently or in the future be developing information internally, or receiving information from other parties, that is similar to the Proprietary Information. Nothing in this NCNDA will prohibit the Receiving Party from developing or having developed for it products, services, concepts, systems or techniques that are similar to or compete with the products, services, concepts, systems or techniques contemplated by or embodied in the Proprietary Information provided that the Receiving Party does not violate any of its obligations under this Agreement in connection with such development.

9. Relation between the Parties. Nothing in this NCNDA shall be construed to constitute an agency, partnership, joint venture or other similar relationship between the Parties.

10. Miscellaneous.

(a) Governing Law. This NCNDA shall be governed in all respects by, and be construed in accordance with, the laws of the State of New York.

(b) Jurisdiction and Venue. Each Party hereby irrevocably and unconditionally consents to submit to the jurisdiction and acknowledge the proper venue of any state or federal court located in New York, NY for any actions, suits or proceedings arising out of or relating to this NCNDA.

(c) Enforceability. If any term, provision, covenant or restriction of this NCNDA is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this NCNDA shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

(d) Counterparts. This NCNDA may be signed in separate counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

(e) Expenses. Each Party will be responsible for its own expenses incurred in connection with the matters described in this Agreement.

(f) No Assignment. This NCNDA shall not be assigned by either Party without the prior

written consent of the other Party to this Agreement, provided such consent shall not be unreasonably withheld.

(g) Entire Agreement. This NCNDA constitutes the entire agreement and understanding between the Parties with respect to the subject matter specified herein and all prior or contemporaneous oral and all prior written documents with respect to the subject matter hereof are hereby superseded. This NCNDA may not be changed or modified except in a writing manually signed by a duly authorized representative of each Party. No failure of either Party to enforce any provisions hereof shall constitute a waiver by that Party of its right subsequently to enforce the same or any other provision hereof. No waiver of any provision of this NCNDA shall be effective unless in a writing signed by the Party claimed to have waived such provision.

[THIS SPACE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Parties having read, understood and agreed to the foregoing, have caused this NCNDA to be executed as of the Effective Date recorded hereunder.

_____
William Werkmeister, Managing Member
MediaWerks Publishing, LLC

_____
Lufti Hassan, CEO
Apex Global Group of Companies

No failure of either Party to enforce any provisions hereof shall constitute a waiver by that Party of its right subsequently to enforce the same or any other provision hereof. No waiver of any provision of this NCNDA shall be effective unless in a writing signed by the Party claimed to have waived such provision.

IN WITNESS WHEREOF, the persons signing this Agreement on behalf of the Parties hereto warrant, covenant and represent they are duly authorized to execute this Agreement on behalf of the parties for whom they are signing. The Parties, by their authorized representatives, have executed this Agreement as of the Effective Date.

COMPANY: Apex Rx Solutions, LLC

_____
By: Sohail Hassan
Title: President

CONSULTANT: MediaWerks Publishing, LLC

_____
By: William Werkmeister
Title: Managing Member

## APPENDIX – LIST OF INITIAL COVERED COMPANIES

As of the Effective Date of this Agreement, Consultant has introduced to Company the following Proposed Relationships. Additional companies to be added via written or email notice upon Company Acceptance.

1. Meijer
2. Save On (and wholesaler, for Save On)
3. State of Michigan
4. State of Texas
5. State of California
6. State of Washington
7. Jeremy Adamic
8. GR8 Seas Holdings
9. _____
10. _____
11. _____
12. _____
13. _____
14. _____
15. _____